Untracht v. Fikri et al., No. 06-4221. I have Mr. Heppel. Heippel? Heippel. And Ms. Kurles. Kurles. I'm not doing well so far. Mr. Rogers, did I get that right? Okay. Okay, Mr. Heippel. May it please the Court. Mr. Kurles, Mr. Rogers. Your Honors, my name is Attorney Russell Heippel. I practice law in Johnstown, Pennsylvania. I represent Dr. Untracht in his appeal from the grant of summary judgment by the District Court for the Western District of Pennsylvania. I'm going to request five minutes of rebuttal time. That's fine. Mr. Heippel, let me ask you. Reading your brief, I find it very difficult to follow the thread of your argument. Nevertheless, there was an amicus brief filed which discussed grave concern about the peer review and the due process afforded in the peer review. And from reading your brief, I don't see it at all. And I am concerned. Is there something there that we can't see? Frankly, your brief seems to be disorganized to bring in a lot of irrelevant extraneous matter. And I am concerned about was there testimony before peer review where witnesses were not permitted for Dr. Untracht? Or what exactly is your complaint about the peer review? The peer review was instigated by one of the appellees, of course, Dr. Pickery, who had an opposition to my client, Dr. Untracht. When he first came to Johnstown back in the mid-'90s, Dr. Pickery opposed him being credentialed at Lee Hospital. The doctor subsequently complained to other physicians that Dr. Untracht was taking away his business, that his income had fallen by 50%. When it came time for Dr. Untracht to be reapplied for reappointment, Dr. Pickery was chairman of the surgery department. The doctor took the reappointment paperwork, hid it from the surgery department physicians, the quality review folks. You say hid it? Yes, kept it in a drawer. It was supposed to be done every two years as a matter of state law. He took Dr. Untracht's application and did not present it to the review committee but kept the button pulled up until Dr. Untracht got it released. Dr. Untracht's position is that Dr. Pickery conspired with other physicians, with Lee Hospital, to remove Dr. Untracht from the Johnstown geographic area. I'm interested in the specifics, not in the general. In the application for renewal of privileges, you're saying that Dr. Pickery hid the papers but then they were circulated as they should have been? Yes. Okay. So that that, in effect, was cured? Pardon me? That, in effect, was not – the fact that they had been in a drawer at one time, they were then circulated as they should have been circulated. Is that correct? Yes. Okay. So where was there a denial of due process? He criticizes the denial of due process because Dr. Untracht was called before the review committee because of some surgeries. Dr. Untracht was doing the high-risk elderly patient surgeries. Dr. Pickery had his reports discussed in private with the other fellows on the review committee. Dr. Untracht was not allowed to come into the committee to review his own. Okay. Now, when was this? That was in 1999, I believe, Your Honor. And what review committee was this? That was the Credentials Committee. All right. And was this for renewal of privileges? Yes. And were the privileges renewed? Yes, with restrictions. Dr. Pickery again recommended against the approval, but he was reappointed with an oversight in major abdominal surgeries. That became a real burden because there were so few surgeons in the Johnstown area that it was difficult to have a second surgeon review and stand in with Dr. Untracht while he was doing his surgeries. Let me ask you a question at this point. Yes. One of the challenges in this case is that apparently there was no discovery record developed. Yes. There's a series of challenges or assertions made in the briefing about evidence showing this or that, but there isn't any evidence. There are allegations. So, for example, how do we deal with just as basic a question as antitrust standing here? You know, the law tells us that your client may be a terrific person, but the antitrust laws aren't designed to protect him individually. They protect society generally. So the question is what's the quantity and quality of services available in the general vicinity, whether or not he's injured. That's not the kind of antitrust injury that's being looked at. Yes. So how do we deal with the question of antitrust standing as an example of one issue? There's nothing but allegations in the record. Dr. Untracht's circumstance, Your Honor, is almost on all fours with the Angelico case, the Angelico surgeon. Both surgeons, Angelico was a surgeon in eastern Pennsylvania, shut out of the different hospitals. The district court granted summary judgment on his antitrust claims, but the Third Circuit reversed. And that's the same fact situation here. In Angelico, I believe here the appellees complained that there were three hospitals in the Johnstown area, Kahnemaw being the one that took the most business. It was a Lee Hospital, UMP, University of Pittsburgh related, and then a Wimber Hospital. He voluntarily left Wimber, right? Voluntarily left Wimber, and the appellees say, well, he could have practiced there and therefore kept an income going. Wimber, by statistics, did 5% of the medical treatments in the Cambria County, northern Somerset County area. Those three hospitals, that was it. Dr. Untracht's patients were being refused referrals to Wimber. Dr. Untracht resigned at Wimber because he didn't think that his patients could be treated well at Wimber. And that was the same way with Angelico. Angelico resigned from St. Luke's because he didn't think that his patients would be treated well there. So in Angelico, the Third Circuit found that that was the kind of injury that the antitrust law was designed to prevent. The same circumstances apply to Dr. Untracht. Let's just – we've talked about due process. We've talked about antitrust. Well, we aren't quite through with due process. That's really where I'm heading back to. As a prelude to that, what do you think is your best argument? And then we'll go back to due process. Certainly the antitrust argument also includes the – What do you think is your best argument? Best argument is that physicians at both hospitals combined with the committees at both hospitals to force Dr. Untracht out of practice in the relevant geographical area. His case is on all fours, it would seem to me, with Angelico. There's enough discovery, enough facts that this case should go to a trial of fact. It's not a case where a judge can't make a decision. What's your second best argument? Second best argument, Your Honor, is that the 1983 argument where the individual – because Dr. Untracht was reported to the National Data Bank after his privileges were wiped out at both hospitals. That is state action. He has now just no ability to practice medicine. He does foreign work. He volunteers in Haiti. He volunteers in Guatemala, in Africa. That data bank shuts him out of practice in the United States. That's the second best argument, that through no fault of his own – Going back to the due process because the red light's on. How was he denied due process by the Credentials Committee in 1999? They wouldn't let him give explanation or testimony about the circumstances of the surgeries that were in question. The reviewers who reviewed his practice agreed that there was no reason to – And he wanted to present a position to the Credentials Committee, and they wouldn't listen to him? Yes, ma'am. But at the same time, Dr. Fikri, who was his main competition, his opponent – Okay, but he was not permitted to talk? No, ma'am. Okay. And was he permitted to – Is this preserved? Does this appear in the appendix anywhere that this occurred? Yes. Where? Unrebuttaled. Because the point is, on due process, I don't see much argument here in your brief at all, or very little. And whereas it is picked up in the amicus brief, but it seems like you haven't brought it up. Is that correct? The brief is our best effort, Your Honor. Well, I mean, it's not a very good effort. That's what concerns me. I understand. And if you didn't bring it up, isn't it waived? No, I think it's enough in there that it's not waived. Maybe the appellees can fill us in a little on due process. Thank you. Thank you, Your Honor. May it please the Court, Mr. Heifel, Dr. Untrecht, and Mr. Rogers. My name is Allison Kurlice, and I represent two groups of defendants in this case. The first group I represent is what has been referred to as the Lee defendants, and that includes 15 physicians and medical professions, as well as UPMC Health System and UPMC Lee Regional. And that includes Dr. Pickery? Correct, Your Honor. Well, maybe you can start with the due process part. What happened at the Credentials Committee hearing? At the Credentials Committee, when Dr. Pickery, who was the Department of Surgery, it is true that he did not recommend Dr. Untrecht for re-appointment. What the Credentials Committee did is they hired a physician, Dr. Milburn Jessup. Dr. Jessup reviewed, I believe, nine cases that were questionable with regard to Dr. Untrecht, and he found that in two of those nine cases, in fact, poor surgical judgment had occurred and that had resulted in two patient deaths. The Credentials Committee then revised Dr. Jessup's recommendation, and what the Credentials Committee decided was that his privileges were renewed for an abbreviated term through July of 2000 with continuing peer review, and then there was a request made for a series of supervised operations. Okay, so basically he would need then a second surgeon in the operating room. Okay, you said revised. What did Dr. Jessup recommend, and what was changed? Dr. Jessup recommended, it is my understanding that Dr. Jessup's findings were that in two of the nine cases, there was a problem with surgical judgment. Okay, so this was coming back where you have Dr. Pickery that says, no, we should not recommend him for re-appointment. The Credentials Committee said, you can be re-appointed, okay, and what they did is they gave him an abbreviated term through July of 2000, and normally the credential or the re-credentialing is a two-year period. Dr. Untrock, Mr. Heupel is saying that Dr. Untrock was not permitted to present his side of this dispute. Is that correct? My understanding is that he was throughout, because this is the first step. This Credentials Committee was not the only due process right that we're talking about. This due process rights in this credentials and this fair hearing began in the Credentials Committee. What then happened was after the Credentials Committee made their finding with regard to continuing peer review, you should have a second surgeon, the board, the lead board of directors, then it goes up the chain, and that's the due process is that it doesn't just stay in the Credentials Committee, it then goes to the board of directors. And what the board of directors then does in reviewing these things is they granted Dr. Untrock unrestricted clinical privileges for two years. They said from February 1st of 99, you could have it for two years, but they also requested again that Dr. Untrock have a second surgeon present. Dr. Untrock, a letter was sent to him, now we're talking March of 2000. This is moving forward. We're not talking about the state lawsuits that were filed, we're just talking now about what was his due process in the internal fair hearing. Dr. Untrock was sent a letter informing him that the board of directors also then had taken now a second surgeon, and the second surgeon that they wanted to review Dr. Untrock's surgeries was a Dr. George Benz. He was not in the Johnstown area. He was not a competitor of Dr. Untrock's. Dr. Benz then observed six surgeries of Dr. Untrock's through the period of May of 2000 through February of 2001. In addition, Dr. Benz also then reviewed the records of six other surgeries. Okay, so now this is our second review by an outside physician. Dr. Benz writes a letter then to the medical director of UPMC Lee, again recommending that a second board-certified surgeon be involved with Dr. Untrock in all major abdominal procedures. Dr. Untrock then appeared before the credentials committee, and this is May then of 2001, and he submitted a 33-page letter with his discussion, whether he obviously didn't agree with Dr. Benz's findings. Then Lee, the board of directors, selected Harvey Slater, and Dr. Slater, again, a surgeon outside of the area of competition, Dr. Slater was supposed to review the reviewers. So this is now a third outside physician surgeon that is coming in. Excuse me. Go ahead. We're listening to you. Go ahead. Thank you. This is then a third outside surgeon that's coming in that is not competing with Dr. Untrock. Dr. Slater reviewed the reviewers. Now, at this point, the executive committee then and Dr. Slater agree with the restrictions that we need, that Dr. Untrock needs a second surgeon. And at this point now, this is going forward, the due process, July 13th of 2001, they advised Dr. Untrock, the executive committee, that he can request hearings. Dr. Untrock, there's another arm of this going on through state court. You know what would be helpful is you've told us a great deal about what the reviewers did. The argument we're getting from the other side is, in essence, yeah, but I didn't get to tell my side of the story. Why don't you tell us about that? How do you get a chance to tell his side of the story? This is exactly where we are, so your question is great. Because at this point, this is when we have then the 19 hearings, which composed over 2,000 pages of transcripts and 200 exhibits. Okay, there were 19 hearing days. And this is where Dr. Untrock presented evidence, submitted numerous lengthy, lengthy letters, positions. He was able to cross-examine witnesses. He was able to introduce evidence. I mean, he put on, I mean, normally these hearings don't last 19 hearing days, and that's exactly why the position that- Was he present during all 19 days? Excuse me? He was present during all 19 days. Yes, he was. He, and in the beginning it was he and his lawyer, and then later on it was just Dr. Untrock. And did he present any witnesses? Yes. And was he excluded from presenting any witnesses? No. The only time that there was a potential exclusion was after this entire thing had run its gamut, and then we were in the final stages of it, where he wanted to have sort of like an ability to add some supplemental stuff. And this is after all of the stuff had already been done. And after the hearing process had been exhausted. So Dr. Untrock was in no way deprived due process in this internal fair hearing at UPMC Lee. In fact, UPMC Lee went out of their way to ensure that Dr. Untrock was heard, and by the 2,000, excuse me, 3,000 pages of hearing transcripts, it is clear. I should have probably counted up how much Dr. Untrock was speaking on it, but it's clear that he had more than ample opportunity to present his case and to be heard. Let me ask you. Am I right that, I know there's a lengthy administrative record as you've described. Once these charges were brought, was there discovery that went on in the civil case in front of us now? When you say once these charges were brought, you mean once the complaint, the various complaints? Yes. Yes, there was discovery. What happened in this case is Dr. Untrock, it was in response to the amended complaint. We had a complaint and then an amended complaint. At that point, Judge Gibson did come forward with a scheduling order which had discovery. The defendant sent over timely discovery request. We then requested Dr. Untrock's deposition, which was taken, and we were going to actually make ourselves available between Christmas and New Year so we could fit it in. We had already two days. We were going to fit it in. The lawyer at the time representing Dr. Untrock said, I can't make it during that week so we're not going to be Grinches. We said, okay. Discovery was extended. It was only after then discovery was extended to February 14th that then we received voluminous, voluminous requests for production of documents, over 25 interrogatories. So the opportunity was there. At no point did Dr. Untrock, you know, he had seven months that he could have conducted discovery. We as defendants in the case were not surprised when discovery wasn't forthcoming because we had 3,000 pages of a hearing transcript. I mean, Dr. Untrock had ample opportunity to get this information. The short of it is there wasn't discovery until after Judge Gibson thought it was appropriate to allow it. Is that what you're telling us? No. We conducted discovery within the defendants within the seven-month period. But the plaintiff did not. The plaintiff did not, and that was his decision. Right. All right. Thank you. Thank you. Mr. Rogers. Thank you, Your Honors. My name is William James Rogers. I represent what the district court referred to as the Kahnemaw defendants, which consists of Memorial Medical Center and eight physicians, Drs. Saluzzo, Kolf, Duke, Pye, Fritz, Weigandt, Carney, and Frey, and I hope I pronounced all those names correctly. I'm going to make two important factual points, and then I would like to address some of the concerns that the judges have expressed to the appellants in this case. The first thing I think it's important for the court to recognize in this case is that Dr. Untrack was appointed to Kahnemaw's medical staff back in 1995. His problems with that entity surfaced in 1999. Dr. Untrack allegedly disclosed these problems to Kahnemaw in connection with his recredentialing applications at that institution. There was no adverse action taken against Dr. Untrack at Kahnemaw until after the November 22, 2002 incident that was described in the district court opinion that involved the death of a patient. And at that point, Kahnemaw took the measures that it took in this case that eventually resulted in the termination of Dr. Untrack's privileges. I think that's an important point. Well, the operation was November 22, I think. The operation was November 22. What happened thereafter? Shortly thereafter, there was a decision to remove him, suspend his privilege temporarily. Then there was a decision approximately a month later, I believe, to terminate his privileges. He was given every due process right that he was entitled to under that proceeding. And that brings into the second point, that Dr. Untrack's so-called competitors in the field of general surgery were not members of the hearing panel that heard the evidence, reviewing the decision to terminate Dr. Untrack's privileges or the recommendation to terminate his privileges at that point. Only the board can actually terminate his privileges. The medical staff can only suspend or recommend termination of privileges. Those competitors were not involved in any way in the hearing panel. The hearing panel was comprised of physicians who were on the medical staff but who were not surgeons, not Dr. Untrack's competitors. The hearing was presided over by an attorney, Mr. Thurman, who is a very prominent health care attorney in the Pittsburgh area, who was selected as the presiding officer. There were no objections made to the composition of this hearing panel. And again, just like in Lee, lengthy hearings, lengthy transcripts. Dr. Untrack was not restricted in any way in the fashion in which he could call witnesses. And, in fact, called each and every witness at that hearing, was present on all of the days of that hearing. And that eventually was the proceeding that resulted in a recommendation that his privileges be terminated. That recommendation went to an appellate review panel, which affirmed the recommendation. And that appellate decision then went to Kahnemaw's board of directors. Again, no evidence, no allegation that any of the board of directors was comprised of any of Dr. Untrack's competitors. That board of directors heard the reports, had the evidence, had the recommendations, and made the decision to terminate the privileges. So, to the extent that we're talking about a due process violation in this case, Dr. Untrack had ample due process in this case. The second point that Judge Roth mentioned was this amicus discussion of sham peer review. And I share in your confusion about that. But to the extent that I can decipher anything from that argument at all, it is that what they seem to be saying is that peer review, per se, is concerted action for purposes of the antitrust laws. Because peer reviewers have to agree before they can do anything. So, therefore, you have to have an agreement because, you know, there's three positions on the panel. You know, at least two of them have to agree before anything happens. So, that is, per se, a concerted action for purposes of the antitrust laws. And that simply is not the law of the Third Circuit or any other circuit that I know of. And, in fact, if you look at the Matthews case cited in our brief and cited in the district court opinion, not only is that position unsupported, but it is specifically rejected. That the court says peer review decisions by themselves alone are not concerted action for purposes of the antitrust laws. Even if one were to stretch it far enough to say they were, is there any evidence here of injury to the public generally? Absolutely none, to be honest. And that, I think, is another point that's very important to make. And, in particular, with respect to the Sherman Act, or the Section 2 claim, the monopolization. You know, what Dr. Untrecht isn't complaining about there is that there was a monopoly because these two hospital institutions merged. He's not complaining about the fact that Lee and Kahnemaw ultimately merged well after his privileges had been terminated, but that somehow he was excluded from participating in that monopoly. And that, again, is not an antitrust violation. I mean, if you wanted to create a monopoly, the best way to do it would be to include every conceivable surgeon who asked you for permission to operate in your facility. If your intent was to create a monopoly, that's what you'd do. So his theory doesn't even make any economic sense. Not only isn't there any evidence to support it. I see my time's running out, so unless you have any other questions. Thank you. Your Honors, the district court really never got the merits of this case. It decided it on the appellee's motion for summary judgment, didn't get into the due process aspect, did not get into the Lee-UPMC-Kahnemaw merger. And your complaint argued due process or made a due process complaint? Yes. And the judge restricted. My client did, through a prior attorney, seek discovery. The appellees would not provide discovery. It's at a point. Well, didn't Judge Gibson determine that you folks came sort of out of the weeds at the last minute and that was going to be intolerable under the schedule that had been set up in advance? I mean, you make it sound as if there just was no opportunity, given what I hear from the other side and what it looks like from the record is there was just a decision not to engage in the process until too late. What's your response to that? That's not entirely incorrect, Your Honor. Dr. Untreck did send out an interrogator timely. In November, I think the cutoff was January, but in November he sent out, as the attorney indicates, lots of discovery. They just didn't want it answered. The doctor then approached the court, but the court then on February 10th of 2005 entered an order staying all discovery until the motions were done. So as a practical point, the doctor couldn't attempt to enforce his discovery, and as a result he didn't have any. How long was discovery held open? Pardon me, Your Honor? How long was discovery held open initially? It was held open, it seems from— When the court said that there would be discovery, how long was the time period? About seven months, Your Honor. And that's not enough? For Dr. Untreck, it was not. In fact, nothing in the way of a discovery request, no interrogatory, no request for admission, no request for documents, no notice of a deposition, nothing was done until— November. Well, I may have it wrong and I'll have to go back and look, but I was under the impression that this didn't happen at all until a point in time when to have answered would have been taking them past the discovery deadline. Is that inaccurate? Yes. Okay. Yes. I'll check the record. Although it would seem to me that at the time, the court could have indicated to both parties the discovery, that Dr. Untreck should file something to determine what discovery was, to enforce some kind of discovery order, maybe streamline the case a little bit. That didn't happen. The judge then decided a summary judgment, and that terminated the case. But the discovery that Dr. Untreck was looking for would, I think, have been helpful to Judge Gibson concerning the merger of Kahnemaw and Lee Hospitals, which involved communications to Dr. Untreck that if he didn't settle up his problems with Lee, that this merger was going to have some difficulties. There might be some judgments that Kahnemaw didn't want Lee to bring into the merger. The discovery would have been helpful, and I think the court, instead of entering summary judgment, should have given some time to Dr. Untreck to firm up some discovery requests. One thing before you sit down. You've mentioned Judge Gibson, and Judge Gibson did a 69-page opinion. Is that correct? Pardon me, Your Honor. A 69-page opinion? Yes, sir. And you've got in your argument here, you start off by saying, well, there were distractions and pressures on him because of a massively overloaded docket. Therefore, the system failed. And then you talk about him being, again, unreasonably burdensome caseload. But then you go on page 34 of your brief and said that the district court erred in misrepresenting the facts with respect to the 1981 claim. On page 40, you say, once again, the district court has grossly and materially misrepresented the explicit evidence. Page 50, in its blind devotion to the defendants, this particular section of the opinion is probably the most vexing for the extent of its misrepresentation. And then on page 72, you go and you talk about, by bucking its own trend and refusing to dismiss the state law claims with prejudice, the district court seems to have signaled to parties in this honorable court that although it lightened its caseload of a serious, complex, and laborious matter, it would not excuse the wrongs the defendants have perpetrated on the plaintiff and the public. And although the district court was not perfect in adjudicating the matter, perhaps it was ultimately wise enough to err in ways that make it easy for this honorable court to achieve the justice too difficult to obtain from within the district. I have no clue what that means, but you don't go after a judge ad hominem like you did here. The guy was trying to do his job. It looked to me like he did a pretty credible job, at least was attempting to do a very credible job and a very thorough job. And to have you come in on a brief and tell people that they're not, that the reason we should overturn it is because a 69-page opinion isn't enough, doesn't fly. Don't do it again. I understand. And it was that type of language that I was referring to when I was saying your brief was not helpful and it was very difficult to understand exactly what the relevant points of the case were. I understand. Thank you. Thank you. We'll take the matter under advisement. Next case before us is Philadelphia Marine Trade Association, International Longshoremen's Association pension fund et al.